UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | 2:16-CR-00114-RLJ |
| | ) | |
| vs. | ) | |
| | ) | |
| JAMES SUMMERS, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**REPORT AND RECOMMENDATION**

This matter is before the Court pursuant to 28 U.S.C. § 636 and standing orders of the District Court for a Report and Recommendation on Defendant James Summers' ("Defendant's") Motion to Suppress the statement he gave to law enforcement [Doc. 50]. The Government has filed its response in opposition [Doc. 58]. On May 11, 2017, the Court conducted an evidentiary hearing on the motion. For the reasons stated, the Court recommends the Motion be DENIED.

**I.    Findings of Fact**

James Summers is charged with possessing stolen firearms and possessing firearms by a convicted felon [Doc. 3, *Indictment*]. He has filed a motion to suppress a statement he gave to law enforcement in which he admitted to possessing the firearms. He claims that his statement should be suppressed because his initial arrest on state charges was without a warrant and illegal. He also argues that he made his statement at a time when law enforcement had no right to continue to detain him as he had made bond on the underlying state charges. Rather than release him, he alleges, they continued to detain him to extract a confession.

At the evidentiary hearing, Lt. Connie Ball, a detective with the Cocke County Sheriff's office, Officer Max Laughter, and former Jail Administrator Tommy Large testified. Based on the

1

testimony from the hearing, the Court makes the following findings of fact. On February 1, 2016, at approximately 3:00 p.m., Judd Summers called Cocke County 911 and reported that his house had been burglarized. A back window had been broken out and numerous items had been stolen from his home, including several firearms, a television, and prescription medications. Detective Ball responded to the scene and witnessed the broken window. Judd Summers advised Detective Ball that he believed his brother, James Summers, had burglarized his home. Detective Ball took his statement and gave Judd Summers his cell phone number if anything else were to happen.

Later that evening, at approximately 5:30 p.m., Judd Summers went to the Parkway Inn in Newport, Tennessee. By happenstance, there he saw his brother, James Summers, unloading one of his television sets from a car and carrying it into one of the motel rooms. He immediately called Detective Ball and advised him of what he saw and identified the room in which his brother had taken his television. He also reported that he saw Tiffany Gentry, his brother's girlfriend, there as well.

After the call, Detective Ball headed to the motel. Judd Summers called Detective Ball again, this time reporting that Gentry and his brother had left the Parkway Inn and that he intended on following them. Based upon this information, Detective Ball then informed other officers to be on the lookout for the car Gentry was driving.

Detective Ball arrived at the motel by approximately 6:10 p.m., and along with some officers with the Newport Police Department ("NPD"), knocked on the door of the motel room identified by Judd Summers moments earlier. Jennifer Shackelford, also known as Jennifer Holt ("Holt"), answered the door. Detective Ball informed Holt of the burglary he was investigating and the information he received about James Summers recently carrying items into her room. From his position in the doorway, Detective Ball could see the television sitting on the floor,

2

unplugged. Holt said she did not know whose television it was, but confirmed that James Summers had brought it to the room.

They asked Holt if they could enter the room to search it, which Holt permitted. Inside they found Rodney Shackelford and Amy Lloyd and discovered prescription medication, which belonged to Judd Summers. Because both Shackelford and Lloyd had active warrants out for their arrests, NPD arrested them. They both gave statements to Detective Ball confirming that James Summers had brought a number of guns and a television into the motel room. They advised that when James Summers left, he left the television there, but took the guns. Judd Summers returned to the motel and identified the items as belonging to him.

As a result of these facts, Detective Ball drafted three Affidavits of Complaint outlining the essential facts he believed existed to support criminal charges against James Summers:

> James Patrick Summers busted out a back window at 164 Sunshine Circle in Newport, Tennessee and the victim and owner of the home is Judd Summers of the same address. James Patrick Summers entered through the window and stole several items from inside the home including the following: Savage Axis Camo rifle …, Remington 770 7mm mag. …, Glock 23 (40 cal.) … Highpoint pistol (.45 cal.) … Funai 32 inch TV …., Sony 32 inch TV …, SKS 7.62X39 rifle …, 21 gauge pump shotgun with wood stock …, 1 black pistol safe or box … and a variety of prescription pills and bottles. The pills and bottles, 7 mm ammo box, black gun box or safe, and the Funai 32 inch TV were recovered from room 132 at the Park Way Inn Motel on the Cosby Highway. James Patrick Summers did not have consent of the property owner to enter his [h]ome. The home was entered with force. The total amount of theft is valued at $2845.00 and this includes the busted out window damage that occurred during the burglary.

At about 9:05 p.m. that evening, Detective Ball presented the affidavits to magistrate Jacob Wines in Cocke County. Magistrate Wines found probable cause to believe that James Summers had committed the criminal offenses identified in the affidavits,[1] and as a result, issued three arrest

---

[1] The Affidavits alleged that James Summers committed theft of property over $1,000, aggravated criminal trespassing, and aggravated burglary. [Doc. 58, pg. 4].

warrants for him. Detective Ball then called Lt. Steve Johnson, with the Cocke County Sheriff's office, to notify him that arrest warrants had been issued for James Summers.

Later that evening, Lt. Johnson and other NPD officers stopped Tiffany Gentry who was driving the car that had been at Parkway Inn earlier. During the traffic stop, Gentry informed the officers that James Summers could be found at Motel 6 and provided them with his room number. In response, Lt. Johnson and other officers traveled to Motel 6. At some time between 10:30 and 11:00 p.m., Lt. Johnson obtained the room key from the front desk and confirmed what room James Summers was in. An officer knocked on the door, but when no one answered, another officer unlocked the door with the room key.[2] Officers then entered the room, found James Summers laying on the bed, and placed him under arrest. They transported him to the Cocke County jail. Detective Ball contacted booking and asked them to notify him if he attempted to make bond as he wanted to interview him.

The following day, on February 2, 2016, Detective Ball discovered that James Summers had a prior felony conviction, which made his possession of the firearms stolen from Judd Summer's home also a crime. He signed another Affidavit of Complaint before a magistrate who found probable cause to believe that James Summers had committed that offense and issued another arrest warrant. Detective Ball served it on James Summers that afternoon at the jail. He did not have any conversations relating to the charges with him at the time.

Later that day, James Summers became irate that he was in jail, and began making a tremendous raucous, kicking the cell door until a jailer would come talk with him. When Tommy Large, an administrator at the jail, came over to investigate why James Summers was making such an uproar, James demanded to speak with Detective Ball. He wanted to tell his side of the story.

---

[2] A video of the arrest was introduced into evidence at the hearing.

Large called Detective Ball to inform him of the request. Because the detective was out interviewing other witnesses, he could not meet with James Summers immediately.

The next day, on February 3rd, prior to James Summers being released on bond, a jailer escorted him to Detective Ball's office. There Detective Ball read him the *Miranda* warnings and asked him if he wanted to waive his rights and speak with him. James Summers voluntarily signed the acknowledgment and waiver form, knowingly and voluntarily waiving his *Miranda* rights. He then proceeded to tell the detective that he had nothing to do with the burglary, that Rodney Shackelford was the one who burglarized Judd Summers' home. He admitted, however, to possessing the firearms that Shackelford had stolen. Detective Ball wrote down the statement, read it back to him to verify its accuracy, and both the detective and he signed it. He was then escorted back to the jail, and shortly thereafter, was released on bond.

## II. Discussion

### A. Defendant's Arrest

Defendant asserts that Detective Ball had not obtained arrest warrants for Defendant prior to his arrest at the motel. He claims that law enforcement had no basis to enter the motel room and arrest him when they did. Since the arrest was illegal, Defendant claims, his eventual confession was obtained illegally and should be suppressed.

It is well-established that "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980); *see United States v. Lyons*, 488 F. App'x 40, 42 (6th Cir. 2012) (quoting *Payton*); *United States v. Taylor*, 666 F.3d 406, 409 (6th Cir. 2012) (same). The protections of the Fourth Amendment extend to motel rooms when the defendant can show that "he had an actual

5

(subjective) expectation of privacy in the room and (2) that this expectation was one that society is prepared to recognize as reasonable." *United States v. Lanier*, 636 F.3d 228, 231 (6th Cir. 2011) (internal citations omitted). It is undisputed that Defendant had an actual and reasonable expectation of privacy in his motel room. Thus, the officers were required to have a valid arrest warrant to enter the motel room to arrest Defendant.

At the hearing, Detective Ball testified that magistrate Wines issued the arrest warrants at approximately 9:05 p.m. on February 1, 2016. Defendant was not arrested until almost an hour and a half later between 10:30 and 11:00 p.m. Thus, the arrest warrants were signed by a magistrate prior to the Defendant being arrested. The arrest was not illegal. Detective Ball's testimony about the time the warrants were issued went uncontradicted.

To the extent Defendant's motion otherwise challenges law enforcement's entry into the motel room, the Court finds nothing unconstitutional about their entry. To enter a motel room, law enforcement had to have "reason to believe" that Defendant was present in the motel room. *See Payton*, 445 U.S. at 603. In this case, Gentry specifically told the officers during her traffic stop which room Defendant was staying. They also spoke with the motel manager who provided them a key to the room. While there was some initial confusion about the exact room Defendant was staying in, whether it was 104 or 204, based on all the information they had before them, they had every "reason to believe" Defendant was in the motel room they entered to arrest him. Accordingly, the Court finds that there are no constitutional problems with the officers' entry into the motel room.

**B.** *Franks* **Hearing**

During the suppression hearing, Defendant attacked for the first time Detective Ball's Affidavits of Complaint, arguing that because they contained false information, they were invalid.

See *United States v. Brown*, No. 16-6291, 2017 WL 2055630, at *3 (6th Cir. May 15, 2017)("If a defendant shows that the police used "false statements" to obtain a warrant, *Franks* gives the defendant the right to obtain an evidentiary hearing to challenge its validity"). The affidavits allege that James Summers broke out the back window of Judd Summers home. Later investigation revealed that it was not James Summers but Rodney Shackelford who actually broke out the window.

This issue was not raised in any pleadings and thus the issue is waived. However, even if it had been raised, Defendant is not entitled to a *Franks* hearing. To be entitled to a *Franks* hearing, he must make "a substantial preliminary showing that the misstatement in the arrest warrant was made knowingly, intentionally, or with reckless disregard." *United States v. McWhorter*, 515 F. App'x 511, 516 (6th Cir. 2013). Defendant does not, however, claim that Detective Ball intentionally misrepresented the facts in his affidavit or had any reasonable belief that the information was false, nor does the Court find a basis to believe Detective Ball engaged in any deceptive behavior. It quite frankly seems obvious that James Summers was involved in the burglary as he was seen just a short time after the burglary attempting to hide the stolen property. Thus, he would not be otherwise entitled to a *Franks* hearing.

### C. Alleged Illegal Detention

Defendant also asserts that he was illegally detained after he made bond to allow Detective Ball to question him. He argues that it was through "the coercive actions of law enforcement" that resulted in Defendant confessing. He also claims that giving him *Miranda* warnings does not cure the taint of the illegal detention.

A jailer escorted Defendant over to Detective Ball's office *prior* to Defendant making bond. No evidence was presented that contradicted that timeline. Thus, Defendant was not illegally detained at the time he met with the detective and admitted to possessing the firearms.

The Court also finds Defendant's statement to be voluntary. The Sixth Circuit "uses a three-part inquiry to determine whether a confession is involuntary under the Due Process Clause." *United States v. Luck*, 852 F.3d 615, 622 (6th Cir. 2017). The Court focuses on "first, whether the police activity was objectively coercive; second, whether that coercion was sufficient to overbear the defendant's will; and third, whether the coercive conduct was the crucial motivating factor in the defendant's decision to offer the statements." *Id.* (citations and quotations omitted).

None of these factors is present in this case. There was nothing objectively coercive or threatening about the meeting between the detective and Defendant. Detective Ball testified that he had a casual conversation with Defendant at the time he took Defendant's statement. Detective Ball was neither coercive nor threatening. Defendant was brought over to meet with the detective because Defendant had begged the day before for the meeting. He was not being illegally detained at the time he spoke with the detective. Law enforcement was simply accommodating Defendant's request. The detective testified that he has known Defendant for 17 years and knew his family very well, and the conversation he had with Defendant was casual. Under the totality of the circumstances, the Court finds that Defendant's statement was the product of an essentially free and unconstrained choice made by Defendant after being properly *Mirandized*. See *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

### D. Right to Counsel Violation

During the hearing, Defendant raised for the first time another ground to suppress his statement. Because that issue was not raised before the hearing, it is also waived. However, the

Court also finds it without merit. Defendant claims that the detective violated Defendant's right to counsel when he spoke with Defendant on February 3rd at a point when Defendant had appointed counsel. Defendant argues that he must have been arraigned on the original three charges on February 2, 2016, and that he was, most likely, either appointed counsel or given the business card of an attorney to contact. As such, Defendant argues that it was possible that Defendant had counsel when Detective Ball spoke with Defendant on February 3rd. He argues that the detective should have contacted Defendant's attorney or asked Defendant who represented him prior to questioning.

The Court first notes that this argument is entirely based on conjecture. No proof was introduced that Defendant was appointed counsel on February 2, 2016 or that he was arraigned on that date. The record is silent. None of the witnesses were able to recall when Defendant was brought to court and whether he was appointed counsel at that time.

Even assuming, *arguendo*, Defendant had been appointed counsel before his conversation with Detective Ball on February 3rd, even after counsel is appointed, law-enforcement officers may approach a defendant, ask him to waive his right to counsel, and initiate questioning. See *United States v. Rojas,* 553 F.App'x. 891, 893(11th Cir. 2014)("[J]ust because a defendant is represented by counsel does not mean police are precluded from approaching [that] defendant and seeking [his] consent to interrogation." (citing *Montejo v. Louisiana*, 556 U.S. 778, 789 (2009)).

In this case, Defendant waived his *Miranda* rights, which included a waiver of his right to counsel. A suspect's valid waiver of his *Miranda* rights generally amounts to a waiver of his Sixth Amendment right to counsel too, "even though the *Miranda* rights purportedly have their source in the Fifth Amendment." *Montejo*, 556 U.S. at 786 (holding that when an accused "is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees

9

to waive those rights," such action is sufficient to waive his Sixth Amendment right to counsel too). In either case, a waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010).

Before taking Defendant's statement, Detective Ball read to and informed Defendant of his *Miranda* rights in front of a witness. Defendant chose to waive his rights and give his statement. He did not request counsel even when he was advised he had the right to do so. His waiver and his subsequent statement were otherwise voluntary. Accordingly, the Court finds that this claim is without merit.

### III. Conclusion

Based on the foregoing reasons, the Court respectfully RECOMMENDS that Defendant's motion to suppress [Doc. 50] be DENIED.[3]

>
> Respectfully submitted,
>
> s/Clifton L. Corker
> United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).